Mr. Eaton, you may proceed. May it please the Court, my name is Tim Eaton and I represent the appellant for Crystal Lake Limited Partnership who is the plaintiff below. I would like to address two issues this morning, otherwise we would stand on a brief but of course would answer any questions that the Court may have as to anything. First of all, I would like to address the fact that there was a J&OV issue against my client on the jury verdict related to the holdover and we would like to see that reinstated. And secondly, I will be addressing the fee petition. The other issues again will stand on a brief. If we were to grant the reversal on the judgment notwithstanding, would we be able to address the fee petition or would we have to, because it would change the amounts significantly. It would. And that's why, Your Honor, we asked for relief alternatively. We asked for the Court to grant us the amount we sought but we also asked alternatively to remand this back to the trial court so that the new judge, because as I understand it, the judge is retired, the new judge could consider the amounts. Because that's one of the factors that they have to look at, is the proportionality. And we admit that. Is it correct that unless you stipulate to having that judge read the But here would be the basis for that. I would think that any judge could look at the procedural history of the case and see the twists and turns that actually followed the verdict. Most of the fees actually were incurred subsequent to the verdict because of all the post-trial activity. So I'm not sure that he or she would have to read the entire record to make that determination so they would not need to be re-tried. Counsel, in your brief, at page 11, you indicate that on June 3rd, Barry Warner was declared a holdover, given notice that they were declared a holdover tenant. Yes. Pursuant to paragraph 16 of the leases. And part of paragraph 16 says at the very beginning, if the tenant holds possession of the lease premises after the termination of this lease, and of course June 3rd was after the termination, whether by lapse of time or otherwise, tenant shall pay, etc. What, they had moved out by May 31st, so we're not talking about lapse of time. What is the or otherwise? And is that anywhere specified in this lease or contract? First of all, Your Honor, we believe the answer to that question turns on the issue of possession. And in the holdover provision that you cited, paragraph 16, it talks about whether they maintain possession. So that was the key issue. It's not defined in the agreement. Both sides submitted instructions on what does possession mean. The possession instruction that was actually given is the fact of having or holding property in one's power, the exercise of dominion over property. Actual physical possession or occupancy is not necessary to constitute the retention of possession. Possession may be inferred from the surrounding facts and circumstances. So it was our position during the trial, and post-trial in arguing this, that the fact that they had to maintain some possession in order to do the work to put it back in the original condition, which was also required under Section 19, was an act of possession. Whether they physically moved their business operation, which they did, I think it was between May 29th and May 31st, the fact that they moved that is not relevant. What this jury was instructed to do is look at what was going to be needed by the tenant to fulfill the obligations under the lease, and that's how they were instructed. So are we focusing then on this issue of restoration or keys or signs or what? Principally restoration. It is a fact that the keys are not turned over until sometime in June. It is a fact that signs are not taken down until August. But we believe the key fact is the fact that they had to maintain some dominion over the property as they were instructed, and they didn't need to physically be there because they had to return the property to its original condition. But the dominion we're talking about, they had e-mail exchanges about who was going to do the restoration and the cost. I believe it was possibly only one time that a representative of Baird and Warner went in there possibly to take a look so that they could see what the restoration would involve and then give a bid. So how was their dominion over that physical space? I'd be happy to answer that. First of all, they were put on notice at the beginning. They gave the notice on January 9th, I believe, of 2009. We informed them, I think it was February 4th, well before the time that they had before the lease terminated, that they had to restore it to its original condition. We repeated that notice on February 9th, March 23rd, May 8th, and May 29th. They stonewalled us. They ignored us. So the way we're looking at it on June 3rd, the work on the premises had not been done. It had to be done over a period of time, and therefore we said, because you have to keep possession of the property in order to do the work under the lease, and that's how the jury was instructed. But the landlord could have gone in under the terms of this lease and done the restoration itself. Isn't that correct? Yes, it is. It says under that provision in Section 19 that the landlord may go in and do the work himself and then bill. But also in Paragraph 32 of the lease, which was in all the leases, it says, All rights and remedies of the landlord herein enumerated shall be cumulative and shall not exclude any other right or remedy provided by this lease or allowed by law. So the fact that he chose not to go in and do it ourselves under the lease is not something that would count against us. And the other thing that I think is important is after they contacted us on June 19th, after they had physically left the premises, not surrendered, but physically left the premises, there was a back and forth of what work needed to be done, how much. I think we had sent them a bid finally per their request of the Klein Construction Company in June of 2009, and the testimony at trial from Tom Iles, Jr. was, I informed Mr. Herbie that we wanted it done. I gave him a bid, and he said, Don't do it because we can do it for less. We're going to take care of it. We can do it for less. And this went back and forth up until almost April of 2010. So that was, as Mr. Iles, Jr. testified at trial, I was tied to just letting them do it because that was our discussion that we'd gone back and forth. And that's what the jury heard. The jury heard that it was going to be necessary for them to have possession to do the work. The jury heard that there was this discussion back and forth, and that's when it started after they left, about who would do it, and that Mr. Herbie had repeatedly said, Don't do it. We can do it cheaper. And that was the basis, we believe, as a matter of fact, for the holdover. Is there a distinction between dominion and access? Your Honor, I don't know. But what I would say is that the instruction that was given to the jury, and, by the way, also the instruction that was given, our tender by Barry Warner, dealt with compliance with the lease and dominion over the property. And we couldn't put another tenant in there during that period of time until the work was done. Ultimately, after one year had run, after we declared the holdover, we put a tenant in there on June 1st, 2010. If you had commenced restoration, would that implicitly have removed access or dominion on the part of Barry Warner? Well, not necessarily, Your Honor, because we would have been doing it on actually their time. They knew that they had to have that done before they left. If we had gone in and had done it after June 1st of 2009, then effectively they would have still been responsible for the rent for the period of time that we were doing the work. Because we couldn't rent it to anyone else. Access and holdover, from what you just said, doesn't sound like they're the identical things. Is that correct? Okay, you said that you were restoring the property. And if you're restoring the property, I don't know how they could have access. But you said that they're still liable for holdover because they're liable for restoration. So it sounds like, are you saying that until restoration is complete, the holdover is not terminated? Correct, regardless of who's doing it. Because the way the jury was instructed, Your Honor, and we believe it was correct, was that a holdover tenant is one who fails to surrender possession to the landlord, the lease premises at the time, and in the condition agreed upon in the lease. And until that condition was met, then they were responsible for those premises in terms of possession. So it's not really a question of access. It's a question of holdover. And that's how this jury was instructed. And, by the way, this jury, as I know this Court is aware from the record, also answered a number of special interrogatories. It found that the defendant, Baird and Warner, failed to perform its obligations under the lease, that Crystal Lake suffered damages as a result, that Crystal Lake suffered or sustained damages as a result of the failure to restore the premises, that Crystal Lake proved that Baird and Warner failed to timely vacate and surrender possession, and that the result of the failure to vacate Crystal Lake suffered damages in the amount of $113,000. These were very specific answers to very specific questions based upon this record and based upon the fact that this was a lease dispute. And I believe what Baird and Warner misrepresents in their brief, that there were just two issues before the jury, and that was the restoration claim and the common law holdover claim. It was not a common law holdover claim. There were five counts of that complaint. Four of them were based on breach of contract. Only the fifth, which is a willful holdover statute, which the jury did not find, we met the burden of proof on that. But it did find that as the breach of contract claims, we prevail on each and every one of those claims. Was Baird and Warner using these three or four suites for storage or were they using them for business? They had business. They had taken down one of the walls. They had a reception desk as you walked in. So it was office space for clients that may be coming in. Okay, so they're doing—we're going to presume they're doing business then. They're actively seeing clients. Sure. If the lease ends on the 31st and they leave, when during the course of their business are they supposed to— or how can they, if they're going to do business, transform this office into— what did you call them, vanilla something or others? Yes, vanilla box condition for units. Thank you. They're doing business. No, I understand. So it seems to me one of two things had to happen. One, they had to move their business to the new spot earlier so they could get the work that was done. Or two, they would have had to try to work around their current setup while they were still there. And I understand that would be hard. Or three, they could have contacted my client and said, okay, we couldn't move into our new place until June 1st. We know we have to do the work, so we'll pay rent for another three months and we'll do the work, or six months. Would that have been a holdover if you had agreed to rent for three months? No, I don't believe so. I think there would have been a dent to the lease that would have provided for what the parties negotiated. The problem here is when they totally ignored us. We kept saying do it, do it, do it, and we get no response. And that's the key because when they then left after the lease was terminated, the work still hadn't been done. We didn't know when they were going to do it. And then they kept telling us, hold off. We'll do it because we can do it cheaper. And that's what this jury heard. And that's why this jury, after being properly instructed on the lease terms, determined that there had been a holdover. Did they present a bid that they had received to you or your client? Later. I think that was like in April of 2010. It was for $25,000. And we said, well, let us know what that will do. And the other thing I just might quickly add, I know my time has expired, but to completely answer your question, this jury did not award us damages based upon an entire year of holdover. It was about half. The entire amount would have been $201,000, and they gave us $113,000. So they must have believed that, well, maybe the work could have been done in six months as long as we give them rent for that six months, not for the entire year. We don't know why they did that, but we do know that they found that the obligations had not been met. Well, at one point there was testimony during the trial that Bernard Warner, Mr. Habib, indicated I believe he wasn't sure really what the restoration involved. And indeed, there were several leases here, were there not? The initial leases and two other sets of leases, and then a brand-new lease in 2004. So if the restoration clause wanted or anticipated a restoration, the question was the 2004 lease was entered into certainly after the premises had been improved. So there may have been a legitimate question about what was really meant. The vanilla box was way back to the 1988 leases. Your Honor, first of all, you're correct. There was an 88 lease, a 99 lease, and a 2004 lease. And it involved different units, the A first and the D, whatever the precise order was. All they had to do was call us when they asked, well, what do you mean by this vanilla box condition? What do you mean by all four units? And we sent a sketch of what we meant. There was no dialogue on their part. Maybe there could have been compromise in terms of how it could have been done prior to the termination of the lease, but they absolutely ignored us, and they admitted that. Well, at one point, though, I believe your client said we've had enough. Apparently they had a tenant. They did the build-out for Julienne's, did they not? They spent, according to your brief and the record, I guess over $25,000. I'm not sure what that exact amount was. And then they also did a second build-out for $57,000 for, I believe it was Click and Go? Yes. For Check and Go. So why couldn't that have been done earlier? And then the holdover certainly wouldn't have lasted as long, so to speak. Why couldn't that action have been taken earlier with respect to Baird and Warner? The record showed that after, up until about April of 2010, when there was this back and forth, back and forth, finally they decided that we're going to go ahead and try to lease the premises. And, by the way, Julienne's did not take possession until June 1st after the one-year holdover. And they were given credit for, I think it was up to $25,000, as I understand it, credit and rents to do whatever restoration needed to be done. Later, when this Check and Go came in, which is 2012, two years later, there was $57,000 spent by the landlord to do that. What we had wanted, and the reason we gave them notice so early, after they gave us notice they were leaving, is that all these units could be returned to a more profitable state, because we had a real estate expert who said, you're going to get much more square footage if it's returned to the original four units. And that's why we were hoping we'd get all that done. But, yes, in April of 2010, we negotiated the lease with Julienne's, and they took possession on June 1st. When they offered you the $25,000, did they also include architectural drawings? I don't know. I don't know whether that was in the record or not, Your Honor. I do know that there was some discussion back and forth between my client and Julienne's, which ultimately resulted in some sort of credit up to $25,000, which is the amount that was in the record. Any other questions? No, Your Honor. Thank you. You'll have an opportunity to make your vote. Thank you. Mr. Shapiro? Thank you, Your Honor. David Shapiro, on behalf of the defendant, Avery Barron Warner, residential sales agent, which I'll just be referring to as Barron Warner. And my co-counsel, Sarah Cook, gives her regrets. She has health issues. She could not be here today, but she wanted to be. It's pretty clear what the court and what counsel has focused on, and I think that it's fair to say that the plaintiff's theory of the case is anomalous, that it's contrary to the body of law established since at least 1940, based on the cases that have been cited, with respect to how a holdover is created in the state of Illinois. I'm not aware of any case that allows for a holdover to be declared when actual physical possession has been given to the landlord timely and the premises are not in damaged or trashed condition, and, in fact, they're marketable. And we know they're marketable because they put signs up even before we left, Barron Warner gave the plaintiff permission, which they had to, I think, under police, but they did give him permission to put police signs up in, I believe, February or March. Yes, but, counsel, this is a breach of contract case, is it not? And so we look to the terms of the contract, and the provision I asked Mr. Eaton about in the beginning was paragraph 16. Isn't that what defines what a holdover is under these circumstances, so that we really don't look to the traditional landlord-tenant cases where a holdover certainly is defined by time lapse, that somebody doesn't leave physically by the end of the term of the lease, but rather we have to look, do we not, and the jury had to look via its instructions based on paragraph 16 to this language in paragraph 16 plus, of course, some of the other terms, which says that if tenant holds possession of the lease premises after termination of this lease, so after May 31st, whether by lapse of time or otherwise. So I noticed that you had brought that up earlier. Right, right. And so the only time I think that issue ever came up in this case was during the summary judgment briefing, and there were cross motions which were denied by the court. And that language, I think, did briefly come up. What that language refers to, Your Honor, is how a lease can be terminated, and there's more than one way a lease can be terminated. One is by lapse of time, which is what it says, or otherwise. Otherwise could be for violation of a lease term. Right. And the violation of the lease term would be the failure to restore. I mean, so in essence, I think Mr. Eaton was arguing, in essence, constructive possession because they still had to retain dominion in order to fulfill the other term of this lease, this contract between the two parties. Well, first of all, Judge, I think this is a matter of grammar or semantics. I think if you look at this, after termination of lease, whether by lapse of time or otherwise, refers to the termination of the lease for violation of a – the actual termination of the lease for some reason other than by lapse of time. And I think that if you look at that and it's a matter of construction, I think the construction of that is unrelated to the issue that the Court is discussing. But I do believe that – I totally agree that the holdover here was based on Section 16. And Section 16 is pretty clear. It says a tenant holds possession of the lease premises after termination of this lease. And then it goes on to say during the time which possession is so held, during which possession is so held, et cetera, et cetera. I think it's repeated five or six times. There is no basis under the law to define possession in any other way than its normal – whether it's Black's Law Dictionary or Webster's Law – Webster's. There's no – I don't think there's a single case that's been cited, Your Honor, where a constructive possession was determined under Illinois law to be a holdover or the basis for declaring a holdover. What you have to look at – and, of course, all the other holdover cases, I believe there were leases involved, and they have their own lease terms and they have their own holdover terms. So I don't think we can ignore the body of the law in my law with respect to holdover. And in determining whether a holdover has been created, you have to look at the tenant's conduct and what its intent was. And clearly here, Your Honor, it was Mary Warner's intention to vacate. They gave notice in January, which was discussed in e-mails. So clearly the landlord knew that we were moving. And then, of course, they sent a bunch of e-mails saying, well, we want you to do this, we want you to do that. You have to bring it back to the original condition. And you brought that up as well. What was the original condition? Is it the ADA? Is it the 2004 when two new leases were entered into? And also, if they had refused your client's access to recreate the original condition, could you not then claim that they breached the contract and created a situation where they prevented you from completing your responsibilities under the contract? I don't know, Judge. I hadn't thought about that. What I think under the circumstances here was that they had the landlord had clear express remedies under both the surrender provision, if we breached it, and the restoration provision, if we breached it. And it basically said that if we breached those provisions, the landlord could do the work and charge us, and charge Beard and Warner. But it was at their election, right? Right, at their election. They chose not to do that work. And, in fact, if you really read this record, the work was never done. So there was a proposal to do the work for $101,000. They didn't do that work. That was basically an estimate-slash-proposal. And that's what the jury heard. And that's what the jury ended up basing its award on, the restoration. And the restoration damages are a judgment at this point. We consented to that judgment to bring an end to this, or hopefully what we thought would maybe bring an end to this case. So that's really not relevant. There's already been a full recovery, probably even more than what we ever believed would be appropriate. But we agreed to that. So that included this $101,000 plus other work. When you say there was a full recovery, would you enumerate what was fully recovered? Yes. So the $154,000 judgment is made up of the $101,000 that their contractor said it would cost to do the work, and then some additional costs, which brought it up to $111,000 and some change, which is what the jury originally awarded. And then in additional, the difference between the $111,000 and the $154,000, about $40,000, was based on what their expert claimed they were entitled to, because that's how long it would have taken to do the work. So the judgment included more than what the jury originally awarded, and it was really based on what the plaintiff claimed that they would be able to prove at trial. So we put that restoration claim to rest. There's a full recovery for breach of that restoration claim. In fact, we think it's probably inflated, but it is what it is at this point. So it seems to us that what we're really looking at here is a double recovery, because they now want to say, oh, you're a whole other tenant because you didn't restore, so you owe us money for that. Well, you've enumerated one aspect of it. That is, you've enumerated that portion of the breach that related to restoration. What about the portion of the breach that related to holdover or continuing possession of the property, which would be required in order to give you the ability to comply with the terms of the contract? Well, Your Honor, I don't believe that constitutes a holdover. I'm sorry, I didn't hear what you said. I don't believe that debt under Illinois law constitutes a holdover. We may have had an obligation to do construction work. We breached that obligation, and they received damages for that. So to say that we would have needed to maintain, this is obviously the theory of the case that the eithers from day one believe was appropriate, but that's not what the leases say. Well, when you say Illinois law and we're interpreting a contract, it would seem that if the contract provides that it's a holdover or it's a hold under or it's a hold sideways is really not material unless there's some public policy or case law in the state of Illinois that says that such a holding is improvident. So when you say you don't think it relates to or that Illinois law covers this, could you explain to me how Illinois law doesn't cover an agreement between the parties insofar as the attempt to enforce it? Your Honor, with respect to creating a holdover when actual physical possession has been surrendered, and that's uncontroverted in this case, I don't believe that there's any Illinois law with respect to that issue. The closest case that I'm aware of is a case that was cited multiple times, but in that particular case, all that the court really said was that it's generally a question of fact as to whether there was possession or not. But in that case, there was an agreement between the parties to actually do the work before the lease terminated. There was clearly work that needed to be done. The parties entered into an agreement to do the work, and the tenants started to do the work, but they couldn't finish in time. So because they couldn't finish, they were still technically, physically in possession of the premises, and under that theory, the trial court found that there was a holdover. But the appellate court reversed, saying no, that's a question of fact. But in that case, Judge, it was actual physical possession, and even there, the appellate court reversed. Here, Judge, we have no physical possession, and the word dominion has come up numerous times. I think it's been defined by blacks in at least one of the briefs. Dominion is actually stronger than possession. I mean, dominion and control means basically ownership. I mean, you have the full right to use of the premises, and the fact that dominion is actually included in one of the instructions, it's clearly contrary to what occurred here. And the trial court found that it adhered by giving the other possession instruction, which said that actual physical possession is not required. In Judge Caldwell's ruling, he found that he adhered in giving that instruction. Well, your argument seems to be that with Illinois law regarding holdovers, that if there is a holdover and that the restoration of the property is no longer a responsibility of the tenant, if the tenant is precluded from restoring the property, and supposedly since he's given up possession, he doesn't have the right of access, so ipso facto, he's relieved from restoring the property. Judge, that would be a breach of the restoration provision. Damages would be awarded, and in fact, they were awarded. And so to say that we're going to impose damages for your failure to restore, which is a breach of the contract, but on top of that, because you didn't do the work, you should have come back on, and therefore there's constructive possession, we're going to tack on, in this case, they attempted to tack on over $200,000. The jury awarded half of that, and without there's really no understanding as to why they did what they did. But the holdover declaration does not refer to anything other than failure to restore. And the declaration says you are now a tenant for another year. Mr. Eaton says that both sides submitted instructions, but it was your instructions that were utilized. Is that correct? No, Your Honor. We objected, well, there were, as is obvious, some of our instructions were used, but the key instructions here, the possession instruction that we objected to, that said the actual physical possession is not required, we objected to that. And we also objected to another of the possession instructions. So, yeah, did we object to every instruction? No. Did we object to key instructions? We believe we did, and there's a record of that. So it was the jury that determined the question of possession here. And if the instruction was correct, then as we're looking at this case, we have to view all of the evidence in the light most favorable to Crystal Lake Limited Partnership, correct? And if there is any evidence, according to the appropriate standard, or inferences that can be drawn from that that demonstrate a factual dispute, then we have to reverse the judgment, NLV, do we not? Yeah. I think in some ways this case, I mean, there's other issues in this case, but in some ways the key issue in this case clearly is the issue of possession and whether or not there was a holdover. And our position is that, and there are a number of JNLB cases that we've cited, that JNLB is proper where the plaintiff fails to establish or prove an essential or record that element of its claim. And here that element is clearly possession. I think that's going to be the key decision for this Court to make. We don't believe that they proved possession, and we believe that possession under both the contract, Section 16, and all the cases that have been cited in this case, even the cases cited by the plaintiff, require possession. And it's uncontroverted that my client timely vacated the premises, left it in marketable condition, left it in largely, there was no damage. But where is this lease? Does it say marketable condition as opposed to restored condition? If you read the provisions of the lease together. So there is reference, and there was reference in that jury instruction to not only vacating physically, but the condition that it was left in. Yeah, I think that what the restoration, you can take a look at that, if I actually have it in front of me, the Section 19 restoration provision. 19. Which is actually called alterations and additions. Right. Paragraph 19. Correct. Tenants shall, either before the expiration or termination of the lease term, remove such alterations and additions and restore the lease premises at tenant's sole cost and expense as they were before such alteration and additions were made by tenant ordinary wear and tear accepted. And then it goes on to say, we don't do it. Landlord has the right to do it and charge us. And you can get interest on it. They didn't do that. I don't think they, they never even made an attempt. They got a proposal and never did that work. Did your client initially object to restoration? Well, one thing I can agree with Mr. Reden on is that there was bad communication. So if you, this is a long, fairly convoluted record, but if you go back in time, this is all taking place in late 2009 and then into 2010. We're in the middle of the Great Recession. Bergen Warner Residential Sales, their business was a sale of homes. They were teetering. They had laid off hundreds, and this is the record, laid off hundreds of employees who were closing offices left and right. And they were trying to deal with this. But we have a, and the Mr. Baird that's being dealt with at this time is not the Mr. Baird who entered the initial contract back in, what, 1988? No, he was not a party to the 80s. He was around for quite a while. He's still the CEO of the company. But no, not 1988. He was involved. He signed the 2004 leases. But what do these provisions mean? I think, Justice Eoff, I think you mentioned, well, which leases were in play here? Was it the 88, the 99, or the 2004? In our mind, it was the 2004 because those were the most recent leases, and they had replaced prior leases. One of those leases, actually there were two leases. One was for Space A, B, D, and one was for Space C. Space C had never been occupied before. So that's obviously a new lease. So our position was these are new leases. So the question was, what is the condition they're supposed to return? Because if you go back to 2004, there had neither been a record store, I think it was a beauty shop in there, and it was in bad condition, and that particular tenant was not required to restore, as a matter of fact. But they did send you something that represented the restoration they had contemplated. They sent us a site plan. So it shows configuration. And I heard Mr. Eaton say several times today, if they had just called, if they had just acknowledged, we were not unwilling to negotiate. Was there any, I know it's the Great Recession, is there any negotiation that was attempted during this period of time? Because these parties, for better or for worse, had been friends. It's interesting, you know, and I don't, you know, it's hard to, you know, sometimes you can speculate, what was the, you know, what was the relationship between Ryan and Sauer and all that. And there's some of that across examination of Mr. Eilers' senior credit. Like I said, one thing I can agree with Mr. Eaton was there was bad communication. Mr. Baird, the testimony is that Mr. Baird said, look, to Mr. Habib, who was a CFO, really wasn't a lawyer, he said, look, I know Mr. Eilers. I'll deal with Mr. Eilers. We'll deal with that after. We need to get out of there. We need to focus on other things. And so immediately after they received the holdover declaration, communication started. Unfortunately, that's what it took, and I think that it's fair to say that this holdover declaration really was sort of a, you know, a warning, saying, hey, we got your attention now, so let's try to resolve this. But it still, there still wasn't any real good communication after that. There might have been communication, but it wasn't good communication. We had Mr. Eilers' senior talking to Steve Baird personally. They met. There was numerous communications. They couldn't work it out. In the meantime, Mr. Eilers Jr. and Warren Habib were talking. But to say that somehow Mr. Habib tied Mr. Eilers Jr.'s hands, I mean, these are sophisticated parties, and so at any point in time, the plaintiff could have said, okay, enough is enough. We're going to do the work. We're going to charge you. You're going to pay us interest, and you're going to pay us the attorney's fees. But they didn't do that. They chose to keep negotiating until they found a tenant in April of 2010. While holdover was still in effect, the alleged holdover was still in effect, and signed a lease. They marketed it. They brought people in to look at it. They brought Julie Yangs in. They physically brought them in while we supposedly were a holdover tenant. So were they trespassing? That may have been reflected in the holdover judgment because, in fact, it could have been almost twice as much, correct? The holdover declaration said it was $201,000 plus expenses. Okay. You mentioned fees, and I guess I have a question. Should we not remand for fees here? Was it appropriate? I mean, did not the trial court apply an incorrect legal standard of proportionality here rather than reasonableness of the fees that were requested? Well, what I think is that Judge Caldwell had the benefit of all the briefs, all the time records, all arguments, and having observed the entirety of this case. And based on his 20 years on the bench, this is what he determined to be reasonable under the circumstances. And he cited one other besides proportionality, which I think is a legitimate consideration. It's also a one-way attorney fee provision under the Rockford v. Stop-and-Go case that it's an implicit prevailing priority provision. And in this case, as things stand right now, Barry Warner prevailed on two of the three claims that the plaintiff took to trial. And I think it was the judge's belief that under those circumstances, $565,000 in fees, which is going all the way back to day one, including all the fees incurred with respect to the holdover that they lost on, was inappropriate. Now, would it have been helpful to have some findings? Perhaps it would have been. But Judge Caldwell had the benefit of being the trial court throughout these proceedings, and this issue was briefed comprehensively. So I think in the record, the Court had everything it needed to make a determination as to fees, and that was the judge's determination of reasonableness under the circumstances. But prevailing priority, I think, is an important factor here. Thank you. Thank you. Your time is up. Thank you, Your Honor. Mr. Eaton, you may proceed. Thank you, Your Honors. Let me pick up on the last point, and I would like to address some of the other holdover claims. In the briefs on the attorney's fees, there's the McHenry Savings Bank case, which was issued, an opinion issued by this Court, where there are nine factors to consider, only one of which is a reasonable connection between the fees and the amount of the litigation. The other eight were not considered here. I agree with Justice Hutchinson's question and observations. Wouldn't this have to go back? And I believe, yes, it would, in all honesty, because I think those other eight factors have to be considered. Did the trial court counsel argue that Judge Caldwell did consider them, Why do you disagree with that? I disagree with that because if you look at one of the factors, which is the time and labor required to respond to what was going on, in this case, I read, as this Court does, common law records all the time. There are three volumes in the common law record. The verdict comes in the first volume. The other two volumes deal with everything that occurred afterwards because the judge decided afterwards that he had given the wrong instruction on the restoration, but then changed his mind again and said it was the less of the two. He had given the wrong instruction on the holder, according to him. We disagree with that. He found the J&OV. He allowed additional discovery. Then there was the wrong standard of view with respect to his determination of the J&OV. It was first manifest weight, then it was later the actual PEDRC standard. So there was a lot going on, and we do not believe that that was adequately addressed in his reasonableness. Otherwise, we didn't want to have to spend all this money, but at every juncture after we got a verdict, there was a change in what was going on. So we believe that all of those factors have to be considered. Did he change these things sua sponte, or was it on motion of the appellee? The rulings with respect to the J&OV was obviously pursuant to the appellee's post-trial motion. The conditional ruling on the jury instruction with the holdover was when they sought conditional rulings. Then they sought a change in what he had ruled on the standard regarding whether it was diminution or cost, and he changed it again. He had the wrong standard originally in the J&OV, and they filed a motion to clarify to make sure in the record it would be correct. So to answer your question directly, yes, it was prompted by motions, but there was a lot of change in what was going on. With respect to the holder, I just pulled over. You've all asked very good questions to both of us, and so I know you understand it, but the one thing that I did want to clarify, just to be clear, is that what I did say with respect to the holdover instruction that they tendered that was rejected, it was not much different from ours. So for them to claim, well, there should have been a common law holdover instruction given rings hollow because this is their instruction, a holdover tenant that they tendered. A holdover tenant is one that fails to surrender possession to the landlord. The lease premises at the time, and as agreed upon in the lease, that was their instruction. Their instruction focused on what did the lease require that could make someone a holdover tenant, and that was exactly what we said in our instruction. So there's no error here with respect to the holdover. With respect to the possession instruction that was given, which we argued for, which said that you don't need to have occupancy, counsel just represented on their instructions that occupancy is required. It didn't say that. If you look in the reply brief that they filed with Moshe on motion, there's a copy of what they intended on possession, and it did deal with dominion, but it had nothing to do with whether or not there had to be occupancy. So this jury was instructed properly. They understood the facts, as was evident from their special interrogatory answers. They knew what was going on, and it really was a fact question, which is evident in all the cases that have been cited with respect to breach of contract, holdover tenancy. It's a fact question, and we respectfully ask that this Court affirm the verdict with respect to the holdover claim and remand this back for attorney's fees and the other issues of the case. Thank you very much. Any questions? Thank you. We'll take the case under advisory. There will be a short recess.